Gregory SOLOMON, Patricia Beckwith, Raleigh Brinson, and Earl Jennings, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

LIBERTY COUNTY, FLORIDA, Gene Free, Chairman, Commissioner, Joe Burke, Commissioner, James E. Johnson, Commissioner, J.L. Johnson, Commissioner, John T. Sanders, Commissioner, their successors and agents, all in their official capacities, Defendants–Appellees.

Gregory SOLOMON, Patricia Beckwith, Raleigh Brinson and Earl Jennings, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

LIBERTY COUNTY SCHOOL BOARD, FLORIDA, Ras Hill, Chairman, Joseph C. Combs, Tommy Duggar, W.L. Potter, Herbert Whittaker, members of the Liberty County School Board, their successors and agents, all in their official capacities, Defendants–Appellees.

Nos. 87–3406, 87–3406A.

United States Court of Appeals, Eleventh Circuit.

Dec. 12, 1988.

David M. Lipman, Lipman & Weisberg, Miami, Fla., for plaintiffs-appellants.

Jack F. White, Jr., Hal A. Davis, Quincy, Fla., for defendants-appellees.

Before TJOFLAT and HILL, Circuit Judges, and HALL *, District Judge.

TJOFLAT, Circuit Judge:

## I.

These consolidated cases involve challenges under section 2 of the Voting Rights

* Honorable Robert H. Hall, U.S. District Judge for the Northern District of Georgia, sitting by designation.

Act of 1965, 42 U.S.C. § 1973 (1982) (as amended), to the at-large method of electing the county commission and the school board of Liberty County, Florida.[1] The commission governs the county; the board operates the county's school system. Each body has five members who serve for staggered four-year terms. *See* Fla. Const. art. 8, § 1(e) (county commission); Fla.Stat. § 100.041(3) (1987) (school board). Candidates run for the seat on the commission or school board that bears the number of the "residence district" in which they live. *See* Fla. Const. art. 8, § 1(e) (county commission); Fla.Stat. § 124.01 (same); *id.* § 230.061 (school board). In both the primary and general elections, the entire county electorate votes for one candidate from each residence district. *See* Fla. Const. art. 8, § 1(e) (county commission); Fla.Stat. § 100.041(2) (same); *id.* § 230.08–.10 (school board). Most candidates seek election as the nominee of a political party and therefore must first run in their party's primary election. To win party nomination, candidates must receive a majority of the countywide vote; if no candidate gets a majority of the vote, a second run-off primary is held. *See id.* §§ 100.061, .091 (general provisions). To be elected, candidates must receive a plurality of the vote in a countywide general election. *See id.* § 100.181 (general provision); *id.* § 230.10 (school board).

The appellants, the plaintiffs below, in these cases are four black citizens of Liberty County. They allege that the at-large method of electing county commissioners and school board members violates the Voting Rights Act because the systems deny blacks a fair opportunity to participate in the political process and to elect candidates of their choice.[2] The appellants therefore seek injunctive relief. The present electoral systems, they contend, should be disbanded and the county should be divided into five districts, each of which would elect one member to the commission and to the school board. One of these single-member districts would have a black majority, thus alleviating the discrimination of which they complain. The appellees in these cases are the Liberty County Commission, the Liberty County School Board, and the members of those bodies in their official capacities. They deny that the at-large method violates the Act, as the appellants allege.

At the conclusion of a bench trial, the district court found for the appellees, observing that under the current at-large electoral system black citizens had more political influence than they would have under any single-member district scheme the court could fashion. The court therefore concluded that the evidence presented by the appellants was insufficient to demonstrate a violation of the Voting Rights Act and denied relief. These appeals followed.

## II.

The Voting Rights Act was enacted in 1965 to protect the right of racial minorities to participate effectively in the political process. Section 2 of the Act, which is essentially a codification of the fifteenth amendment, provides that:

> No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

Voting Rights Act of 1965, P.L. 89–110, § 2, 79 Stat. 437, 437.

In *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd sub nom. East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed. 2d 296 (1976), our predecessor circuit developed a method of analysis to guide trial

---

**1.** These cases were originally brought separately. In No. 87–3406, the plaintiffs challenged the at-large system for electing the county commission; in No. 87–3406A, they challenged the at-large system for electing the school board. The district court consolidated the cases for trial.

**2.** In No. 87–3406A, the plaintiffs also alleged that the challenged electoral systems violated the fourteenth and fifteenth amendments. These constitutional claims are not before us on appeal.

courts in determining whether an electoral system denied a minority group access to the political process on account of race when no direct evidence of discriminatory intent exists. First, the trial courts were to determine whether the plaintiffs had demonstrated that their minority group was underrepresented in proportion to its percentage of the total electorate. If the plaintiffs demonstrated such underrepresentation, the courts were then to determine whether the underrepresentation was caused by an intent to discriminate; the courts would do so by making a number of factual inquiries. Called the "totality of circumstances" test, these inquiries included:

1. [Whether] any history of official discrimination in the state or political subdivision ... touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. [Whether] voting in the elections of the state or political subdivision is racially polarized;

3. [Whether] the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. [Whether] members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals; and

7. [Whether] members of the minority group have been elected to public office in the jurisdiction.

*Carrollton Branch of the NAACP v. Stallings,* 829 F.2d 1547, 1553 (11th Cir. 1987) (summarizing the *Zimmer* inquiries), *cert. denied,* —— U.S. ——, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). If the findings of fact yielded by these inquiries, taken as a whole, gave rise to the inference that the electoral system's discriminatory effect was driven by racial bias in the community or its political system, the plaintiffs established a violation of the Act. The court could then remedy this violation by eliminating the challenged multimember electoral system and, in its place, establishing an appropriate number of single-member electoral districts drawn along racial lines to assure roughly proportional minority representation.

In 1980, the Supreme Court enhanced the plaintiffs' burden of proof in vote dilution cases. *See Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). In *Bolden,* the Court held that the Voting Rights Act required the plaintiffs to prove that the responsible government officials "conceived or operated" the challenged electoral system as a "purposeful device to further racial discrimination." *Bolden,* 446 U.S. at 70, 100 S.Ct. at 1501 (citing *Whitcomb v. Chavis,* 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971)). Thus, an inference of racial bias yielded by the seven *Zimmer* inquiries might not be sufficient in a given case to establish a section 2 violation.

In 1982, Congress amended the Voting Rights Act to overrule *Bolden.*[3] The legis-

---

**3.** Section 2 of the Voting Rights Act of 1965, as amended, states that:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section

1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have

lative history of the 1982 amendment indicated that in addition to the *Zimmer* inquiries, in weighing the totality of the circumstances the courts should consider:

[8.] [W]hether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

[9.] [W]hether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 417, 97th Cong., 2d Sess. 29, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 207. Following the enactment of the 1982 amendment, the courts resumed adjudicating vote dilution claims under the totality of circumstances approach. This approach, however, was again modified when, in 1986, the Supreme Court decided the case of *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

In *Gingles,* the Supreme Court added an important gloss to the test for vote dilution claims:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unop-

posed[—]usually to defeat the minority's preferred candidate. In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67 (footnotes & citations omitted). By following the analytic framework announced in *Gingles,* a trial court can answer what we believe are the four questions posed in every vote dilution case: (1) Is the minority group significantly underrepresented in proportion to its percentage of the total electorate? (2) If so, could the minority group achieve roughly proportional representation but for the multimember electoral system? (3) If so, can the minority group establish that the discriminatory effect of the challenged electoral system is driven by racial bias in the community or its political system? (4) If so, can the minority group establish that such bias will continue to prevent the minority group from having equal access to the political process? By asking these questions we do not mean to imply a new test of vote dilution under section 2 of the Voting Rights Act. Rather, we simply restate the procedure a trial court should follow in deciding a section 2 case in order to give due recognition to Congress' affirmance of the totality of circumstances test and the three elements of the *Gingles* gloss. We now examine these questions in turn.

The first question asks whether the minority group is significantly underrepresented in proportion to its percentage of the total electorate. This question does not explicitly arise in most vote dilution cases because, as a practical matter, the minority group would not be bringing suit if it were proportionally represented. The question, however, is fundamental to section 2 jurisprudence because the Voting Rights Act exists solely to remedy inequalities in access to the political process. Thus, unless

---

less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one cir-

cumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (1982).

the minority group can show that it is significantly underrepresented in proportion to its percentage of the total electorate, the minority group has no section 2 claim—even if racial prejudice and discrimination are rampant in the challenged electoral system.

■ Our second question asks whether the plaintiffs would be able to elect one or more representatives *but for* the multimember nature of the electoral system. Phrased in terms of effect rather than cause, this question asks whether the court can provide a remedy for the plaintiffs' injury if vote dilution ultimately is established. While this question was an implicit part of shaping a remedy under the totality of circumstances analysis, *Gingles* gives this question new prominence by making it a threshold inquiry.[4] The plaintiffs meet this requirement by producing the evidence necessary to satisfy the first two elements of the *Gingles* gloss. Thus, the plaintiffs must establish that the minority group can constitute a majority (*Gingles* element 1) that is politically cohesive (*Gingles* element 2) in one or more single-member districts.[5]

■ Our third and fourth questions both primarily rely on the body of evidence produced under the third element of the *Gingles* gloss. The third question asks whether the minority group can establish that the discriminatory effects of the challenged electoral system are driven by racial bias in the community or its political system. The plaintiffs in an exceptional case might be able to produce direct evidence on this point, but in the usual case the answer must be inferred from the totality of the circumstances. The fourth question builds on the third, asking whether the minority group can establish that such bias will continue to prevent the minority group from having equal access to the political process so as to warrant injunctive relief. In other words, the plaintiffs must show that in the election they are challenging, the electoral system will likely discriminate against their minority group.[6]

■ To answer these third and fourth questions, the trial court may have to draw upon all of the evidence produced by the nine totality of circumstances inquiries. Under *Gingles*, however, evidence of white bloc voting—the second inquiry under the totality of circumstances test—is the most probative indicator of vote dilution. If this evidence clearly establishes that whites, voting as a bloc, will probably defeat blacks voting as a bloc plus white crossovers, then the court may infer, solely from this evidence, both that the current system is driven by racial bias and that this bias is likely to dominate the challenged election.[7]

4. The first part of the second question—whether the minority group could constitute a majority in a single-member electoral district—is a straightforward, objective inquiry into the size and geographic distribution of the minority group. If plaintiffs cannot establish an affirmative answer to this question, then the court need not proceed to the far more involved issues of minority electoral cohesiveness, bloc voting, and the other totality of circumstances inquiries. Thus, judicial economy demands that this question be placed in a threshold position, rather than in its usual place in the remedy stage of the litigation.

5. Of course, the resulting single-member electoral system must achieve a more proportional representation of minorities than did the previous multimember system. For example, assume a community that has a 40 percent minority population and is governed by a five-member commission elected at-large from a multimember district. If the community had never elected a minority representative, then plaintiffs could establish the first two *Gingles* elements by proving that the minority could dominate one

of the five created single-member districts. If, however, the community had habitually elected one minority representative, the plaintiffs would have to establish that under a single-member district structure the minority would be able to elect more representatives.

6. By making this statement, we do not mean to imply that the plaintiffs never challenge an election that has already occurred. In theory, plaintiffs can do so; whether they can obtain injunctive relief—in the form of a restructured electoral system and new elections, however, is problematic. To obtain such relief, the plaintiffs would have to overcome the defense of laches—by proving that they had not slept on their rights. In the cases before us, appellants seek to enjoin future elections under electoral systems they claim are discriminatory.

7. Thus, in *Gingles* the Court stated:

the most important Senate Report factors bearing on § 2 challenges to multimember districts are the "extent to which minority

Conversely, if the evidence clearly establishes that whites, voting as a bloc, will not defeat blacks voting as a bloc plus white crossovers, then the court must infer that the discriminatory effect of the challenged system is not the product of racial bias; the plaintiffs' case, therefore, would have to be dismissed on the merits.[8]

Between these extremes, however, will fall situations in which evidence of vote polarization and minority electoral failure is either inconclusive, insufficient, or unavailable due to a lack of minority candidacies. In these cases, the courts must rely on the full range of totality of circumstances inquiries to determine whether the challenged electoral system violates the Act. The Supreme Court recognized this in *Gingles* when it noted that:

> The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances. One important circumstance is the number of elections in which the minority group has sponsored candidates. Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process. Similarly, where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim.

*Gingles*, 478 U.S. at 57 n. 25, 106 S.Ct. at 2770 n. 25.

To summarize, we hold that to establish a section 2 vote dilution claim the plaintiffs must prove (1) that the minority group is underrepresented in proportion to its percentage of the total electorate, (2) that the minority group has sufficient geographic and political cohesion to allow the creation of one or more minority controlled single-member districts, (3) that the totality of circumstances, with special emphasis on vote polarization and the extent of past minority electoral success, permits the inference that the current electoral system is driven by racial bias in the community or its political system, and (4) that this same evidence also leads to the conclusion that the challenged electoral system will continue to deny minorities equal access to the political process.

### III.

In deciding these cases, the district court did not use our four-question method of analysis, nor did the court pay particular attention to the *Gingles* gloss. As a result, the district court made inadequate findings of fact and conclusions of law with respect to several critical issues in these cases. We are therefore unable to provide full appellate review.

Ordinarily, we would remand these cases to the district court for more complete findings of fact and a reassessment of its conclusions of law without intimating any view as to the results the district court should reach. As the following discussion indicates, however, to do so here would simply perpetuate the error that has occurred. Accordingly, we address the factual issues that were before the district court, pointing out those areas as to which the material

---

group members have been elected to public office in the jurisdiction" and the "extent to which voting in the elections of the state or political subdivision is racially polarized." If present, the other factors, such as the lingering effects of past discrimination, the use of appeals to racial bias in election campaigns, and the use of electoral devices which enhance the dilutive effects of multimember districts when substantial white bloc voting exists—for example antibullet voting laws and majority vote requirements, are supportive of, but *not essential to,* a minority voter's claim. *Gingles*, 478 U.S. at 48 n. 15, 106 S.Ct. at 2766 n. 15 (citation omitted) (emphasis in original). We note that minority electoral success or fail-

ure will be an inherent element in any evidence presented as to vote polarization.

**8.** We note, however, that even in the face of compelling vote polarization evidence, a prudent trial court would still perform the other totality of circumstances inquiries. The corroborating evidence produced by these inquiries might salvage the court's decision should a reviewing court later disagree with the trial court's legal conclusion with respect to the sufficiency of the direct evidence—usually, as here, in the form of statistics and expert opinion—of vote polarization.

facts are not in dispute. We also address the legal issues, with especial attention to areas in which the district court misapplied the law. Our discussion adheres to the four-question method of analysis described above.[9]

### A.

The first question asks whether blacks in Liberty County are underrepresented in proportion to their percentage of the total electorate. The undisputed evidence established that blacks comprise 11% of Liberty County's population and that a black candidate has never been elected to countywide office. Though the district court did not answer this question, the record demonstrates that appellants established underrepresentation as a matter of law.

### B.

The second question asks whether blacks in Liberty County could achieve roughly proportional representation in a single-member district but for the multimember electoral system; stated another way, the question asks whether blacks in Liberty County could constitute a politically cohesive majority in a single-member district. Following the pattern laid out in *Gingles*, we first examine the sufficiency of the black single-district majority, and then turn to the issue of black political cohesiveness.

The undisputed demographic evidence in this case indicates that the black population is concentrated in the northwest quadrant of Liberty County. Countywide, blacks comprise only 11% of the total population; if, however, the county were divided into five equally populous single-member districts to accommodate both the commission and school board elections, blacks might achieve a majority in one single-member district. In this district (District 1), blacks

would comprise 49% of the total population, 51% of the voting age population, and 46% of the registered voting age population.[10]

The district court found the registered voting age population to be the determinative factor in establishing a single-district majority under *Gingles*. We hold that reliance on the registered voting age population was improper. Minority voter registration figures are inherently unreliable measures in vote dilution cases because the very lack of minority political power responsible for the bringing of the section 2 action also may act to depress voter registration. Although the language of *Gingles* seems to refer simply to gross minority population, references in the opinion to "minority voters" show that the Court intended the sufficiency of the single-district majority to be measured by the size of the voting age population. *See Gingles*, 478 U.S. at 50–51 n. 17, 106 S.Ct. at 2766–67 n. 17; *see also McNeil v. Springfield Park Dist.*, 851 F.2d 937, 944–45 (7th Cir.1988) (holding that voting age population, not gross population, controls *Gingles* analysis). Although District 1's 51% black voting age population might create only a mathematical majority, if white crossover votes are included, an effective black majority would be achieved in the district.[11] The appellants' evidence showing a 51% minority voting age population in District 1 was therefore sufficient as a matter of law to meet the majority requirement of *Gingles*.

As noted, in addition to geographic cohesion, the appellants must demonstrate that the black community in Liberty County is politically cohesive. To meet this burden, the appellants presented statistical evidence compiled by Douglas St. Angelo, a professor of political science at Florida State University. Professor St. Angelo

---

**9.** In light of our disposition of these appeals, we do not address the fourth question in our method of analysis.

**10.** In concluding that blacks would constitute 51% of the voting age population of District 1, we rely on appellants' evidence, which was not contested by the appellees. On remand, the district court may make further inquiries into the exact demographics of the proposed District

1 to ensure that blacks will constitute a majority of its voting age population.

**11.** We note also that the white crossover demonstrated in these cases is sufficient to compensate for any disparities between the black voting age population of District 1 and the politically cohesive black voting age population of District 1.

performed a series of regression analyses on three sets of elections involving the Liberty County electorate. These regression analyses express a relationship between the percentage of the vote received by a particular candidate and the percentage of black registered voters. The resulting figure, called the "r" coefficient, expresses a correlation that can range from 0.0 (no relationship) to 1.0 (perfectly consistent positive relationship). r values show a statistically significant correlation beginning at about 0.3; statisticians rarely encounter r values in the 0.8–0.9 range.

St. Angelo performed his first regression analysis on the six elections, held over a six-year period, in which a black candidate ran for countywide office.[12] Although the black vote was not united behind one of the black candidacies, that of Earl Jennings in 1980, in the other black candidacies the black vote was sufficiently cohesive to produce a very high average correlation [13] value of 0.787.[14] To provide additional statistical data, St. Angelo analyzed a second set of elections that involved black candidacies for national office and produced an even

**12.** These six elections involved four candidacies:

| Date | Election | Candidate |
|---|---|---|
| May 7, 1968 | School Board, District 1 (1st Primary) | Charles Berrium |
| Sept. 9, 1980 | School Board, District 1 (1st Primary) | Earl Jennings |
| Oct. 7, 1980 | School Board, District 2 (2d Primary) | Earl Jennings |
| Sept. 4, 1984 | County Comm'n, District 1 (1st Primary) | Gregory Solomon |
| Oct. 2, 1984 | County Comm'n, District 1 (2d Primary) | Gregory Solomon |
| Sept. 4, 1984 | School Board, District 1 (1st Primary) | Earl Jennings |

**13.** In this opinion we use an "average correlation" value only for the sake of convenience.

**14.** Appellants' regression analysis of votes received by black candidates for countywide office is as follows:

| ELECTION | PERCENT VOTE RECEIVED BY BLACK CANDIDATES PER PRECINCT/PERCENT BLACK REGISTERED VOTERS PER PRECINCT |
|---|---|
| 1. May 1968 School Board Berrium | .996 |
| 2. September 1980 School Board Jennings | .578 |
| 3. October 1980 School Board Jennings | .280 |
| 4. September 1984 County Commission Solomon | .989 |
| 5. October 1984 County Commission Solomon | .962 |
| 6. September 1984 School Board Jennings | .919 |

higher average correlation of 0.966.[15] Finally, for a third set of election returns St. Angelo turned to a group of elections that revolved around racial issues or themes. This last set of election returns also produced a very high average correlation of 0.925.[16] Based on the correlations established in these three sets of data, the appellants contended that voting patterns in Liberty County were racially polarized.[17]

We are unable to discern from the district court's findings of fact whether the court ultimately found that blacks in Liberty County act in a politically cohesive manner. In one part of its findings, the district court seems to have discounted appellants' regression analyses; nevertheless, in other parts, the court appears to have assumed black political cohesiveness. We need not resolve this contradiction, however, since

**15.** Appellants' regression analysis of votes received by black candidates in state and national elections produced the following results:

| ELECTION | PERCENT VOTE RECEIVED BY BLACK CANDIDATES PER PRECINCT/PERCENT BLACK REGISTERED VOTERS PER PRECINCT |
|---|---|
| 1. September 1970 Democratic Primary U.S. Senate Hastings | .917 |
| 2. March 1972 Democratic Presidential Primary Chisholm | .998 |
| 3. March 1984 Democratic Presidential Primary Jackson | .983 |

**16.** Appellants' regression analysis of votes received by identified candidate or election issue in elections with a racial political content produced the following results:

| ELECTION | | PERCENT VOTE RECEIVED BY IDENTIFIED CANDIDATES PER PRECINCT/PERCENT BLACK REGISTERED VOTERS PER PRECINCT |
|---|---|---|
| 1. November 1968 Presidential Wallace, Humphrey Nixon | Humphrey | .972 |
| 2. November 1970 Governor Askew—Kirk | Askew | .847 |
| 3. March 1972 Straw Ballot Busing | | .901 |
| 4. November 1976 Presidential McGovern, Nixon | McGovern | .984 |
| 5. November 1976 Presidential Carter—Ford | Carter | .876 |
| 6. November 1980 Presidential Carter—Reagan | Carter | .935 |
| 7. November 1984 Presidential Mondale—Reagan | Mondale | .961 |

**17.** Appellees' expert, Charles Billings, a colleague of St. Angelo's at Florida State University, did not contest the accuracy of St. Angelo's results, but instead maintained that the use of bivariate analyses was generally inappropriate in vote dilution cases. Whether the use of such analyses is appropriate in vote dilution cases is

we hold that appellants' evidence established black political cohesiveness as a matter of law.

Bivariate regression analysis is widely used to show racial polarization in vote dilution cases. The Supreme Court, in *Gingles*, recognized the legal significance of this form of statistical analysis, *see* 478 U.S. at 53 n. 20, 106 S.Ct. at 2768 n. 20; this circuit also has approved its use. *See Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1558 (11th Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *see also McMillan v. Escambia County*, 688 F.2d 960, 966 n. 12 (5th Cir.1982), *vacated and remanded* in light of 1982 amendment to the Voting Rights Act, 466 U.S. 48, 104 S.Ct. 1577, 80 L.Ed.2d 36 *aff'd* 748 F.2d 1037, 1043 n. 12 (1984). Despite these precedents, the district court rejected St. Angelo's statistical analyses. The court appears to have done so for two reasons, neither of which is valid.

First, the court found the statistical base for St. Angelo's first regression analysis—the six elections in which a black candidate ran for countywide office—inadequate to support his ultimate finding of black political cohesiveness because voting was not polarized in the 1980 primary elections in which Earl Jennings sought the Democratic nomination for a seat on the school board.[18] The Supreme Court has stated that "the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." [19] *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2770. In the face of data from the other Liberty County black candidacies for countywide office, all of which demonstrated extremely strong black vote polarization, we hold that the trial court erred in disregarding St. Angelo's first regression analysis.

Because Liberty County has had only six elections involving minority candidacies for countywide office, the appellants expanded their statistical information base by having St. Angelo analyze the two other sets of elections we have described. The district court, as its second reason for rejecting St. Angelo's finding of black political cohesiveness, concluded that St. Angelo's reliance on the data these analyses produced was improper because these elections did not involve the electoral systems challenged in these cases.[20] These two other sets of elections, as we have noted, depicted Liberty County voting patterns in state and federal elections involving a minority candidate [21] and in elections in which racial issues were strongly present.[22] As to the latter set, St. Angelo gave specific, unchallenged testimony concerning why the particular elections were included in his analysis. We hold that plaintiffs should be able to buttress their claims of white bloc voting by pointing to racial voting patterns in elections for of-

---

a legal question as to which we give Professor Billings' opinion no deference.

**18.** Evidence relating to Jennings' 1980 candidacy may not be a reliable indication of an absence of black electoral cohesiveness. The district court determined that Jennings was backed by the white establishment in his 1980 candidacy. Jennings, therefore, may not have been the black community's chosen candidate. *See infra* notes 31–32 and accompanying text.

**19.** We note that the terms "racial polarization," "electoral cohesiveness," and "bloc voting" all refer to the same phenomenon. The distinction is one of connotation: "electoral cohesiveness" is generally used in reference to minority voting; "bloc voting" is generally used in reference to white voting habits, and is a pejorative; "racial polarization" is an umbrella term.

**20.** We have already noted that if the small number of minority candidacies prevents the compilation of statistical evidence, the court should not deny the plaintiffs relief; rather, the court should rely on the other totality of circumstances factors to determine if the electoral system has a discriminatory effect. *See supra* notes 7–8 and accompanying text. Thus, even if we were to conclude that Professor St. Angelo's reliance on data from other elections was improper, the statistical evidence adduced from the six elections involving a minority candidacy could be sufficient when combined with the rest of the totality of circumstances to establish a violation of section 2.

**21.** *See* table reproduced *supra* at note 15.

**22.** *See* table reproduced *supra* at note 16.

fices they do not challenge in their section 2 suit. The use of such elections is especially appropriate when few minority candidacies are available. *See Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 502–03 (5th Cir.1987) (allowing use of exogenous elections in vote dilution cases). Professor St. Angelo's regression analyses were indeed probative of black political cohesiveness; accordingly, the district court erred in disregarding them.

### C.

■ The third question in our method of analysis asks whether appellants can establish that the discriminatory effects of the current electoral system are driven by racial bias. As we have observed, this question is usually answered by examining the results of the nine totality of circumstances inquiries. These inquiries are simply different specific manifestations of the third question. As a result, the conclusions that a court draws from them are inevitably interrelated; the trial court's decision on one issue may mandate a parallel conclusion on another. More importantly, misanalysis of one issue may result in a skewed analysis of other issues. Although the court's findings with respect to one of the totality of circumstances inquiries—the presence of white bloc voting—can conclusively answer the third question, the trial court will usually corroborate these findings by pointing to the results of the other inquiries.

In these cases, the district court conducted all nine of the totality of circumstances inquiries. In some, the court followed an incorrect legal standard in analyzing the evidence, thus tainting the findings that the inquiries yielded. In others, the court failed to make findings of fact adequate for appellate review. For convenience, we examine the court's totality of circumstances inquiries in their usual order.

■ 1. *History of Discrimination.* The trial court felt that it was unnecessary to enumerate specific findings concerning the history of discrimination in Liberty County; instead, the court generally noted that North Florida and Liberty County

have an undisputed history of "extensive official discrimination affecting the rights of blacks to participate in the political process." The phrase "affecting the rights of blacks to participate in the political process" is inherently ambiguous and, standing alone, is incapable of meaningful review. Moreover, it fails to answer several important questions that are inherent in the "History of Discrimination" inquiry in these cases. To what acts of discrimination was the district court referring when it stated that North Florida and Liberty County have a history of "extensive official discrimination"? How debilitating were these acts to the ability of blacks to participate in the political process? To what extent do the effects of these acts still influence current political behavior? Without answers to questions such as these, we cannot assess the extent to which blacks in Liberty County continue to suffer from the effects of past discrimination.

Florida first adopted its at-large system for the election of county commissioners by constitutional amendment in 1900. *See* Fla. Const. of 1885, art. 8, § 5 (as amended). The Florida legislature instituted the at-large system for the election of county school boards in 1947. *See* 1947 Fla. Laws 189–90, ch. 23726, §§ 5–9. The district court found that the 1900 constitutional amendment was not racially motivated; the court did find, however, that the 1947 legislation was the product of racial bias. *See McMillan v. Escambia County*, 638 F.2d 1239 (5th Cir.1981) (finding 1947 Florida school board at-large election system adopted with discriminatory intent), *cert. denied*, 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed. 2d 1033 *vacated in part on other grounds*, 688 F.2d 960 (1982).

The Florida legislature required the counties to use the at-large system to elect school board members until 1984, when it enacted the "School District Local Option Single–Member Representation Law," Fla. Stat. § 230.105 (1987). That law authorizes a county's electorate, voting in a referendum, to replace the discriminatory at-large system with a single-member district system. Liberty County, which has not

submitted the issue to referendum, apparently chooses to retain the at-large method of electing its school board members. The district court, in deciding whether this choice is the product of racial bias, gave no weight to this sequence of historical events. As the court stated: "even if the original racial motivation of the Florida Legislature [in 1947] was imputed to the Liberty County School Board 40 years later, this Court would not be inclined to give substantial consideration to this factor." [23]

 The Supreme Court has observed that "Congress intended that the Voting Rights Act eradicate inequalities in political opportunities that exist due to the vestigial effects of past purposeful discrimination." *Gingles,* 478 U.S. at 69, 106 S.Ct. at 2776. In deciding whether the Act has been violated, therefore, a court must "conduct a searching and practical evaluation of *past and present reality.*" *Id.* at 65, 106 S.Ct. at 2774 (emphasis added).[24] The trial court accordingly erred when it refused to give any weight to the legislature's reason—to discriminate against blacks—for prescribing the at-large system as the method of electing school board members in Florida.

2. *Racially Polarized Voting.* The appellants relied on a Racial Polarization Index prepared by Professor St. Angelo to establish white voter polarization in Liberty County. To formulate this index, St. Ange-lo first needed to determine how many blacks voted for black candidates. Three methods are commonly used to make this determination. The first, precinct analysis, was unavailable in these cases since it requires at least one almost all black district. The second method involves exit polling, which was also unavailable. In these cases, St. Angelo used a third method that extrapolates district-wide electoral patterns from the results in certain key precincts. St. Angelo first examined several almost all white voting precincts to determine the percentage of the white electorate that voted for a particular candidate in these precincts. Using these percentage figures, St. Angelo then determined the percentage of the white electorate in the county that voted for a particular candidate. Having established the percentage of the white electorate's vote each candidate received, St. Angelo determined the percentage of the black electorate's vote each candidate received. Subtracting the white percentage from the black percentage, St. Angelo created a Racial Polarization Index.[25] The index analyzed the six elections involving a black candidate for countywide office and demonstrated that, except for one candidacy—that of Earl Jennings in 1980, these elections exhibited significant levels of racial polarization.[26]

**23.** The district court addressed the issue of whether the challenged electoral practices were adopted or maintained with the intent to discriminate in the context of the ninth totality of circumstances inquiry—whether the policies behind the enactment of the challenged electoral systems were tenuous. Since we view this issue as relating to the history of discrimination, we address the court's findings of fact at this point in our discussion.

**24.** We have already noted that direct evidence of present discriminatory motivation in the enactment or maintenance of an electoral system will establish a violation of the Voting Rights Act without the need for circumstantial evidence. *See supra* text accompanying note 6.

**25.** The method St. Angelo used assumed that the racial voting pattern in the almost all-white precincts would be typical of the racial voting patterns in the county as a whole. The district court relied on this fact to discredit the appellants' statistical evidence because it found wide disparities between the socioeconomic conditions in the various precincts in Liberty County. The court, however, provided no specific factual basis for this finding, nor can we find one in the record. Absent proof that such an assumption of uniform racial voting patterns is invalid, we hold that St. Angelo's method did not invalidate the legal significance of his analysis.

**26.** Appellants' Racial Polarization Index found as follows:

| Election | Percentage Vote Received by Black Candidate from Black Voters | Percentage Vote Received by Black Candidate from White Voters | Racial Polariza-tion Index |
|---|---|---|---|
| 1. May 1968 School Board | | | |

The district court concluded that while St. Angelo's racial polarization analysis did establish a *"statistically* significant degree of racial polarization," it did not establish a *"legally* significant" degree of racial polarization. In other words, the district court accepted the statistical validity of St. Angelo's analysis, but found that the analysis was not sufficiently persuasive to constitute proof of white vote polarization.

■ The Supreme Court has recognized that the facts of each case will determine what level of polarization is "legally significant" under the Voting Rights Act. In general, however, the Court has noted that "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2770. The district court failed to apply this legal standard to the evidence.[27]

■ Appellants' Racial Polarization Index identified the amount of white crossover in the six elections involving black candidacies for countywide office.[28] If this evidence is taken in the light most favorable to the appellee, the average white crossover has amounted to 21% of the total white vote.[29] In terms of the total vote, white crossover has averaged 18.5%.[30] The combined voting strength of Liberty County blacks (11% of the total voting population), voting as a bloc, plus the average white crossover is therefore 29.5% of the

| Election | Percentage Vote Received by Black Candidate from Black Voters | Percentage Vote Received by Black Candidate from White Voters | Racial Polarization Index |
|---|---|---|---|
| (1st Primary) Charles Berrium | 100.0% | 2.8% | 97.2 |
| 2. September 1980 School Board (1st Primary) Earl Jennings | 44.7% | 17.0% | 27.7 |
| 3. October 1980 School Board (2d Primary) Earl Jennings | 64.7% | 40.5% | 24.2 |
| 4. September 1984 County Comm'n (1st Primary) Gregory Solomon | 74.7% | 18.8% | 55.9 |
| 5. October 1984 County Comm'n (2d Primary) Gregory Solomon | 90.0% | 32.9% | 57.1 |
| 6. September 1984 School Board (1st Primary) Earl Jennings | 78.2% | 14.5% | 63.7 |

Professor St. Angelo's uncontradicted testimony established that if the Racial Polarization Index figure is above 40, it is considered statistically significant.

27. Appellees' offered the expert testimony of Professor Billings to refute Professor St. Angelo's testimony. Professor Billing's evidence consisted of his opinion, based on interviews with Liberty County residents, that voting in Liberty County is not racially polarized. The district court attached no weight to this opinion, nor do we.

28. *See* table reproduced *supra* at note 26. The column captioned "Percentage Vote Received by Black Candidate by White Voters" constitutes the white crossover.

29. Our average includes the two elections in which no significant levels of vote polarization were found; these elections had the highest level of crossover. Arguably, our average could exclude these elections as aberrations and still be within the legal standards of section 2. *See supra* notes 18–19 and accompanying text.

30. Liberty County is 89% white. 21% of 89% is 18.5%.

total vote. This coalition will always be defeated by the opposing white bloc vote, which constitutes the remaining 70.5% of the total electorate. In sum, appellants presented strongly persuasive evidence of white vote polarization. The district court erred in failing to recognize the legal significance of this evidence.

■ 3. *Other Potentially Discriminatory Voting Practices.* We have held that a section 2 claim " 'is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographic subdistricts.' " *United States v. Marengo County Comm'n,* 731 F.2d 1546, 1570 (11th Cir.1984) (quoting *Zimmer v. McKeithen,* 485 F.2d 1297, 1305 (5th Cir.1973) (en banc), *aff'd sub nom. East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed. 2d 296 (1976)). The district court found that the challenged electoral systems in Liberty County possessed some of these features and that these features "may enhance the opportunity to discriminate against blacks in the election process." This ultimate fact is the only finding that the district court drew from this inquiry. Standing alone, this finding is inadequate.

■ The totality of circumstances test is more than a checklist of factual findings that a trial court must make. As in any case in which the plaintiff's claim is based on circumstantial evidence, the ultimate findings of fact yielded by the court's inquiries must, in most instances, be supported by a solid base of subsidiary findings of fact. These subsidiary findings are essential because they allow the court to judge the strength of its ultimate findings of fact and thus the weight those findings should be given when assessing the totality of circumstances as a whole. Thus, in the

context of this third inquiry, it is not enough to know that certain electoral devices that can discriminate against blacks are present in Liberty County. The court must determine why such devices are present, and how they impact on the right of blacks to participate in the political process. Only after the court asks and then answers these questions, and any other questions the answers to them may prompt, can it give appropriate weight to its ultimate findings.

4. *Candidate Slating Process.* The district court found that several entrenched white families in Liberty County control an informal, unofficial candidate slating process.[31] Gregory Solomon, twice a candidate for the county commission, testified that this process was not open to blacks; the court, however, disagreed, noting that Earl Jennings, who was a candidate for the school board in 1980, had run on a slate sponsored by the county's white power structure.

■ The results of this inquiry illustrate the interrelation and interdependence of the various totality of circumstances inquiries. As we have noted, in assessing the extent of racial polarization (the second totality of circumstances inquiry), the district court discounted appellants' statistical evidence partially because voting patterns were not polarized in Earl Jennings' 1980 candidacy. The reason for this lack of polarization may well be explained by the district court's observation that Jennings had run on a "white slate." Earl Jennings, although black, may not have been perceived as a black candidate.[32] Indeed, if Earl Jennings was not perceived to be a black candidate, the voting patterns in his race were not probative evidence of vote polarization. *See Gingles,* 478 U.S. at 68, 106 S.Ct. at 2776 ("Under § 2, it is the

---

**31.** A slating process is a procedure by which a political group determines the candidates that they will sponsor for particular offices. The resulting candidacies compose that group's "slate."

**32.** Professor St. Angelo testified that blacks did not vote for Jennings in the 1980 election because Jennings was urged to run by one of the

white candidates; some blacks even believed that the white candidate had paid Jennings' filing fee. We, of course, cannot and do not make a finding of fact on this matter. Our discussion is intended only to illustrate how findings on one issue will often affect findings as to another.

*status* of the candidate as the *chosen representative of a particular racial group,* not the race of the candidate, that is important.") (emphasis in original).

On remand, the district court should consider the possibility that the slating of Jennings on a white ticket in 1980 does not permit the inference that the candidate slating process in Liberty County is open to blacks. Particularly, the district court should consider whether the white slating process is open to black candidates who seek to represent black interests.

█ 5. *Lingering Effects of Past Discrimination.* The district court correctly concluded that the lingering effects of past discrimination are relevant only if they continue to "hinder [the minority group's] ability to participate effectively in the political process." S.Rep. No. 417, 97th Cong., 2d Sess. 29, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 206. The court found that blacks in Liberty County bear the effects of extensive past discrimination in areas such as education, employment, and health. Nevertheless, the court found that black voter registration in Liberty County is very high, generally exceeding the level of white voter registration. Similarly, the court found that there was no indication that black voter turnout was lower than white turnout. Finally, the court found that while blacks have a much lower average income than whites, "[t]he nature of Liberty County politics [ ] does not seem to demand great financial expenditures." These comprehensive subsidiary fact findings fully support the court's ultimate finding that black political participation in Liberty County is not impeded by the effects of past discrimination.

6. *Racial Appeals.* The district court found that "overt racial appeals" were made to the voters in Liberty County during "the 1956 presidential primary campaign, a 1956 state senate campaign, and a 1958 campaign for the state legislature," but that "race has not been an issue in recent Liberty County campaigns." Because the court failed to state why it reached this ultimate finding, we cannot determine whether, as appellants contend,

the finding is clearly erroneous. On remand, the court must reconsider the evidence, and therefore its ultimate finding of fact, on this issue.

█ 7. *Election of Minorities.* The district court briefly noted that no black has ever been elected to countywide office in Liberty County. The court found this electoral failure to be of reduced significance, however, noting that "if a [hypothetical] 49 percent minority consistently fails to elect candidates of their race, dilution should be suspected and will be capable of proof. That an eleven percent minority [i.e. the size of the minority in this case] has failed on four occasions to elect members of its race is not nearly so suspect. Proof of dilution in such a case is necessarily much more difficult."

The Supreme Court has held that minority electoral failure is one of the two most probative indications of vote dilution. *See Gingles,* 478 U.S. at 48–49 n. 15, 106 S.Ct. at 2766 n. 15. In a situation such as the one presented here, however, where the racial minority comprises only 11% of the total electorate, we agree with the district court that the nonelection of blacks is of minimal probative value in deciding whether an electoral system is driven by racial bias.

8. *Lack of Responsiveness.* Based on the testimony of the named plaintiffs in this litigation, the district court found that elected county officials "are approachable and sensitive to the particularized needs of black citizens." The trial court also found, however, that in an earlier case a former superintendent of the Liberty County Schools testified that "appointing a black principal would harm a Superintendent politically," *Stallworth v. Shuler,* 35 Fair Empl.Prac.Cas. (BNA) 770, 772 (N.D.Fla. 1984), *aff'd* 777 F.2d 1431 (11th Cir.1985). Faced with these conflicting lines of credible testimony, the trial court ultimately concluded that "[w]hile the Court finds defendants' evidence on responsiveness significant and persuasive, that evidence cannot overcome the mistreatment received by Stallworth at the hands of the Liberty County School System." This statement

prompts several questions which the court's findings of fact do not answer. For example, why did the Stallworth evidence outweigh the named plaintiffs' own testimony that Liberty County officials were responsive? If Liberty County officials are unresponsive to black concerns, to what extent are they unresponsive? Ultimately, how does this lack of responsiveness affect minority access to the political process?

9. *Tenuous State Policy.* The district court found that the state policy behind the challenged at-large electoral systems is well established and therefore is not tenuous. The court, however, made no findings of fact as to what the policy is. In particular, the court did not explain how the state could be committed to a policy of having at-large elections given that its legislature has authorized the counties to abolish them. *See* Fla.Stat. § 124.011 (1987) (county commissions); *id.* § 230.105 (school boards). On remand, the court must answer these questions or explain why answers to them would be of *no moment.*

10. *Other Factors.* The nine totality of circumstances inquiries were never meant to be an exclusive list of all of the inquiries that a court should make in a vote dilution case. As the Supreme Court observed in *Gingles,* "[t]he [Senate] Report stresses [ ] that this list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2764 (footnote omitted). The district court identified three such additional factors during the proceedings below. The first of these, the demographics of the black population, we have already discussed in the context of the other totality of circumstances inquiries. The other two deserve separate discussion.

The court believed that the political importance of the black swing vote in Liberty County should be considered in assessing the validity of the challenged electoral systems because, in the court's view, the goal of the Voting Rights Act is to maximize

black political power. Thus, the court found that since blacks constitute an eagerly sought "swing vote" in county elections, all countywide political candidates and representatives are politically responsive to black voter interests. The court further found that although black voters would be able to elect one representative under the proposed single-member district plan, total political responsiveness to black interests would be lessened since the other four officials (on the commission and the school board) would no longer owe black interests any degree of responsiveness. The court therefore concluded that the current at-large electoral systems better met the purposes of the Voting Rights Act. Because we find that the court misunderstood the purpose of the Voting Rights Act, we need not question the accuracy of the court's judgment as to the political realities of Liberty County.

If we were writing on a clean slate, the district court's interpretation of the Act might well be persuasive; the settled state of the law, however, clearly leads us in another direction. Today, the goal of section 2 is not to maximize the political clout of minorities, but rather to ensure minority representation in government. Thus, the amended Voting Rights Act directs the courts' attention to the question of whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes *and to elect candidates of their choice.*" S.Rep. No. 417, 97th Cong., 2d Sess. 28, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 206 (emphasis added). Whatever the wisdom of this policy—and even if such a policy actually reduces the overall political responsiveness to minority needs—the policy choice belongs to Congress. We therefore conclude that the district court erred in holding that because the current at-large election method better met the purpose of the Voting Rights Act than would a single-member district method, the continued use of the at-large method did not violate the Act.

 The third additional factor deemed pertinent concerned the plaintiffs' commit-

ment to this litigation. The court noted that "many members of the plaintiff class, and some of the named plaintiffs, have either become equivocal or are downright opposed to the maintenance of this lawsuit." While this might be relevant to the adequacy of the class representation, we hold that class opposition to the remedy that may result from the successful litigation of a section 2 claim is irrelevant in weighing the totality of circumstances. The district court therefore erred in considering it.

## IV.

We vacate the judgments of the district court and remand these cases for further proceedings consistent with the views expressed in this opinion.

VACATED and REMANDED, with instructions.

HILL, Circuit Judge, specially concurring:

I concur in the court's judgment.