BLACK, Circuit Judge, dissenting:

I respectfully dissent because the district court's factual findings were not clearly erroneous.

The parties, the Court, and I all agree as to the applicable law in this case. We agree that the district court weighs several factors and there can be no liability unless the totality of the circumstances demonstrates that "the members of the minority group are denied equal political opportunity with respect to their race or color." Opinion at 11 (quoting *Solomon v. Liberty County*, 957 F. Supp. 1522, 1554 (N.D. Fla. 1997)). In addition, we agree that we review a district court's finding of no vote dilution for clear error. *See Thornburg v. Gingles*, 478 U.S. 30, 79, 106 S. Ct. 2752, 2781 (1986). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 1511 (1985).

In this case, the district court conducted its fact-intensive inquiry and found no vote dilution. I have come to the conclusion that the district court did not clearly err. I do not suggest it is impossible that another trier of fact could have reached a different result from that reached by the district court. What I do state, however, is

that the findings the district court made on remand after taking supplemental evidence in this fact-intensive case were not clearly erroneous.

The Court holds that the district clearly erred by (1) considering the electoral success of Earl Jennings, a black county commissioner,[1] and (2) finding the policy underlying at-large election of school board members, adopted in 1953, was not tenuous. The Court believes that these two errors tainted the district court's weighing of three factors—Senate Factors 4, 7, and 9—and resulted in an erroneous ultimate finding of no vote dilution. *See* Opinion at 25, 30-32.

The district court did not clearly err by considering Jennings' electoral success. The Supreme Court has stated that a district court "could appropriately take account of the circumstances surrounding recent black electoral success in deciding its significance." *Gingles*, 478 U.S. at 76, 106 S. Ct. at 2779. The Supreme Court said that a district court could "view with caution" black candidates' electoral success following the filing of a lawsuit and that proof that some minority candidates have been elected does not automatically foreclose a § 2 claim. How much weight to assign to Jennings' sustained electoral success is within the discretion of the district court; a § 2 determination as to vote dilution requires "an intensely local appraisal of the

---

[1]The county elected Jennings to the County Commission in 1990. He was re-elected in 1992 and again in 1996.

design and impact of the contested electoral mechanisms." *Id.* at 79, 106 S. Ct. at 2781 (internal quotations and citation omitted).

Upon closely scrutinizing Jennings' election and re-elections, the district court found no evidence of any special circumstances that would require it to disregard Jennings' electoral success. The district court found that black voters preferred Jennings. This finding was not clearly erroneous. In the Eleventh Circuit, "[w]hether a given minority candidate who has long enjoyed electoral success is the preferred representative requires appraisal of local facts within the ken of the district court and best left to it." *Meek v. Metropolitan Dade County*, 908 F.2d 1540, 1548 (11th Cir. 1990).[2]

---

[2] I do note that the district court may have misused data from voting precinct one to reach conclusions about residential district one. In the 1996 run-off primary Jennings actually received 73.02 percent of the votes in precinct one, not district one. Correcting this error, however, hurts the plaintiff's case. Whereas only 46.09 percent of the voters in residential district one are black, 58.05 percent of voting precinct one is black. If every white voter in precinct one voted for Jennings, he still had to get a majority of the black vote, 53.52 percent to be exact. This suggests to me, as it did to the district court, that black voters prefer Jennings.

Jennings ran against two other black candidates in the first 1996 primary. In that race, Jennings won 24.06 percent of the vote in precinct one, while another black candidate won 52.83 percent. However, in precinct two, which is 56.92 percent black, Jennings won 44.38 percent of the total vote, while the next closest black candidate won only 19.76 percent. The district court's view of the statistical evidence was that black voters preferred Jennings. This view may not be inescapable, but it is at least permissible. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S. Ct. at 1511.

The Court nonetheless speculates that white voters somehow manipulated Jennings' election to defeat this lawsuit, even though plaintiffs have offered us no such evidence.[3] *See* Opinion at 16-18. The Court seems to place the burden on the defendants to disprove its supposition of manipulation. *See* Opinion at 18. However, once the defendants produce evidence of Jennings' repeated success, it is the plaintiffs who shoulder the burden of controverting such success. *See Gingles*, 478 U.S. at 77, 106 S. Ct. at 2780 ("In some situations, it may be possible for § 2 plaintiffs to demonstrate that such sustained success does not accurately reflect the minority group's ability to elect its preferred representatives.") (footnote omitted).

The district court also did not clearly err by finding that the policy underlying at-large school board elections in Liberty County was not tenuous. Although the statute passed by the Florida legislature in 1947 may have been designed to dilute the

---

[3] Indeed, in a 1990 county-wide referendum 59.1 percent of black voters voted against single-member districts for county commission elections, and 60.0 percent of black voters voted against single-member districts for school board elections. The county's black voters thus prefer the current system and oppose the remedy sought (on their behalf, ironically) in this lawsuit. I realize this Court opined in a subsequently vacated panel decision that "class opposition to the remedy that may result from the successful litigation of a section 2 claim is irrelevant in weighing the totality of the circumstances," *Solomon v. Liberty County*, 865 F.2d 1566, 1584 (11th Cir. 1988), *vacated*, 873 F.2d 248 (11th Cir. 1989). Irrespective of their relevancy to weighing the Senate Factors, however, the results of the 1990 referendum certainly militate against the Court's supposition that white officials conspired to manipulate black voters.

voting power of the black community, this case is not about statewide legislation. Rather, this case is about the adoption and continued maintenance of at-large elections by Liberty County. The Court emphasizes that the 1947 Florida statute required the adoption of at-large school board elections. *See* Opinion at 31. While this may have been so as a general rule, counties could opt out of at-large elections by population act. Indeed, Liberty County used population acts to keep its single-member district system until 1953, a fact of which the plaintiffs' expert Dr. Schofner was unaware. *Solomon*, 957 F. Supp. at 1568 n.107. After considering conflicting expert testimony and evidence from both sides, the district court found that Liberty County adopted at-large school board elections in 1953 as a result of a citizen's reform movement to abolish the existing ward-type political system.[4] This finding was not clearly erroneous.

After subtracting the three factors implicated by the two errors it perceives, the Court weighs the evidence for itself and finds that the evidence favoring appellees does not "tip the scales in appellees' favor." *See* Opinion at 32. Because it would have weighed the evidence differently, the Court concludes that the district court's

---

[4] "The ward system had allowed a single family or faction to control each district—effectively disenfranchising other voters (who at that time were all white), while furthering the special interests of the family or faction at the expense of the rest of the county." *Solomon*, 957 F. Supp. at 1568 (citing expert testimony of Dr. Billings and Mr. Eubanks).

finding of no vote dilution is clearly erroneous. By so doing, the Court duplicates the role of the district court and thereby "oversteps the bounds of its duty under Rule 52(a)." *Anderson*, 470 U.S. at 573, 105 S. Ct. at 1511. Accordingly, I respectfully dissent.